This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

     Plaintiff-Appellee,

v.                                                                                          **No. 33,257**

**FRANK TRUJILLO,**

     Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Sarah C. Backus, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Jacqueline R. Medina, Assistant Attorney General
Albuquerque, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**_____MEMORANDUM OPINION**

**SUTIN, Judge.**

{1}     Defendant Frank Trujillo appeals his conviction for larceny (over $2,500 but not more than $20,000), contrary to NMSA 1978, Section 30-16-1(A), (E) (2006), a third degree felony. He challenges (1) the admission of incriminating statements that he made to the investigator/director of the district attorney's preprosecution diversion (PPD) program; (2) the admission of hearsay testimony regarding information contained in documents that the district court had previously ruled were inadmissible on hearsay grounds; and (3) the sufficiency of the evidence. We affirm on all issues.

**BACKGROUND**

{2}     Factual and procedural details will be discussed, as required, in the body of this Opinion.

**DISCUSSION**

**Admission of Defendant's Statements**

{3}     Prior to trial, the district court held an evidentiary hearing to determine whether a program director and investigator for the PPD program, Tomas Trujillo (the director), would be permitted to testify at trial regarding incriminating statements that Defendant made to him by telephone and in person. Defendant argued that his statements were inadmissible under Rule 11-410 NMRA, which provides, in relevant part, that a statement is inadmissible if it was "made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea

2

or resulted in a later-withdrawn guilty plea." Rule 11-410(A)(5). The State did not take issue with whether the discussion was with an attorney. The State argued only that Defendant did not rely on Rule 11-410, Defendant made unsolicited admissions, and his admissions were admissible as admissions by a party opponent. *See* Rule 11-801(D)(2)(a) NMRA.

{4}     After the district court considered the director's proffered testimony and the arguments by counsel, the court determined that even if discussions for consideration into the PPD program could be considered plea negotiations, the facts in this case indicate that Defendant did not rely on Rule 11-410 when he divulged information to the director. Therefore, Defendant's statements were not made inadmissible by Rule 11-410. The district court specifically ruled that "those statements [would] be admissible, if otherwise admissible."

{5}     On appeal, Defendant argues that the district court's evidentiary ruling was erroneous and raises the same arguments he raised at the evidentiary hearing. "With respect to the admission or exclusion of evidence, we generally apply an abuse of discretion standard where the application of an evidentiary rule involves an exercise of discretion or judgment, but we apply a de novo standard to review any interpretations of law underlying the evidentiary ruling." *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 13, 146 N.M. 453, 212 P.3d 341; *State v. Rojo*,

1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 ("We review the trial court's evidentiary rulings for abuse of discretion."); *see also State v. Martinez*, 2008-NMSC-060, ¶ 10, 145 N.M. 220, 195 P.3d 1232 ("A misapprehension of the law upon which a court bases an otherwise discretionary evidentiary ruling is subject to de novo review.").

{6}     The district court relied on *State v. Anderson*, 1993-NMSC-077, 116 N.M. 599, 866 P.2d 327, in support of its determination that Rule 11-410 did not bar admission of Defendant's statements. In *Anderson*, our Supreme Court explained the purpose and application of Rule 11-410. "[T]he purpose of Rule [11-]410 is to encourage negotiations between the defendant and the [prosecution]." *Anderson*, 1993-NMSC-077, ¶ 12. "[T]he determinative factor in excluding statements pursuant to the rule is whether it may be naturally inferred that the defendant relied on the rule in deciding to break silence[.]" *Id.* "[W]hether the defendant relies on the rule depends on the facts of any given case." *Id.*

{7}     "Reliance on the rule" means that the defendant had a subjective belief that his offer to plead and related statements would not be used against him. *Id.* ¶ 13. If the prosecution induces the defendant to break his silence, there is an irrebuttable presumption that he relied on the rule in breaking his silence.

> [W]hen a suspect is *induced* by the [prosecution] to engage in plea negotiations, as in formal plea negotiations with a state attorney (or an

4

agent of the attorney), there will be an irrebuttable presumption that such person has relied on the rule in breaking his silence, and all statements made during the course of "making a deal" are inadmissible in future proceedings, whether the statements are offers to confess or offers to plead guilty, and regardless of whether the declarant has been formally charged with a crime. The court may be guided by the established standards of voluntariness in finding inducement by the [prosecution].

*Id.* ¶ 14.

{8}     The defendant in *Anderson* was arrested in Texas and charged with commercial and residential burglary. *Id.* ¶ 3. While in custody for those charges, the defendant spoke to detectives from New Mexico about a murder that was committed in Santa Fe. *Id.* ¶ 4. The defendant received his *Miranda* warnings, waived his *Miranda* rights, and made implicatory statements to the New Mexico detectives. *Id.* Later, he told a Texas officer that he would confess to committing the Santa Fe murder if the Texas charges were dropped and the agreement was in writing. *Id.* The district court found that the defendant's offer to make a deal was voluntary, and the district court admitted the Texas officer's testimony regarding the defendant's statements. *Id.* ¶¶ 4, 20. Our Supreme Court affirmed. *Id.* ¶¶ 1, 20, 27.

{9}     In the present case, Defendant made incriminating statements to the director on two separate occasions—by telephone and in person. As an initial matter, we note that the director gave conflicting testimony as to whether he informed Defendant that any statements he made would not be used against him. However, it was up to the

5

district court, as the factfinder during the evidentiary hearing, to resolve any conflicts in the director's testimony. *State v. Bloom*, 1977-NMSC-016, ¶ 5, 90 N.M. 192, 561 P.2d 465 (stating that conflicts in evidence are to be resolved by the finder of fact, including conflicts in the testimony of a witness). As an appellate court, we will not reweigh the evidence on appeal. *See id.*

{10} There was evidence that the director sent a preindictment letter to Defendant advising him to obtain an attorney and then to schedule a meeting to determine if he would be appropriate for the PPD program based on allegations that Defendant had used his previous employer's gasoline card for more than $2,500 in unauthorized purchases. *See* NMSA 1978, § 31-16A-6(A) (1981) (stating that "[a] defendant must secure or be appointed defense counsel to be present at a [PPD] screening interview prior to applying for acceptance into a [PPD] program"). Before obtaining counsel, Defendant called the director and made incriminating statements. During the telephone conversation, the director advised Defendant to obtain counsel multiple times but Defendant continued to talk; the conversation got "heated," and Defendant hung up the telephone on the director. While we acknowledge that Defendant called the director in response to the director's letter, there is no evidence that the director induced Defendant to break his silence and make incriminating statements. *Cf. State*

*v. Hastings*, 1993-NMCA-111, ¶ 11, 116 N.M. 344, 862 P.2d 452 (recognizing that "[n]o defendant is compelled to participate in or even apply for a PPD program").

{11} After Defendant was indicted for larceny, defense counsel contacted the director and asked him to reconsider Defendant for the PPD program. Following this conversation, Defendant went to the director's office, without counsel but upon his counsel's direction, and made additional incriminating statements. *But see* § 31-16A-6(A) (requiring defense counsel to be present at a PPD screening interview). According to the director, they went to an interview room, and Defendant "started blurting out stuff."

{12} We hold that the district court did not abuse its discretion in finding that Defendant did not rely on Rule 11-410 when he made incriminating statements to the director by telephone or in person. *See State v. Martinez*, 1983-NMSC-018, ¶ 9, 99 N.M. 353, 658 P.2d 428 (holding that the defendant's offer to plead guilty to murder was voluntary and admissible and noting that the defendant was "urged to talk to her attorney before she made the statement" and she "repeatedly insisted on making the statement, contrary to the advice of her attorney"); *State v. Fernandez*, 1994-NMCA-056, ¶ 30, 117 N.M. 673, 875 P.2d 1104 (holding that even if the letter at issue was construed as an offer to plea bargain, "statements volunteered by the [d]efendant in contacts he initiated with authorities are beyond the protection of

[Rule] 11-410" and there was no evidence that the defendant relied on Rule 11-410 in initiating this contact). The statements made by Defendant were not made in reliance of Rule 11-410, as a result of inducement by the State, nor during formal plea negotiations. *See Anderson*, 1993-NMSC-077, ¶ 1. We affirm.

**Admission of Hearsay**

{13}    Defendant asserts that the district court abused its discretion by allowing testimony as to the value of fuel charges made by a non-employee of AC Towing. Defendant argues that Ms. Cohn's testimony as to the value of fuel charges made by a non-employee of AC Towing was hearsay because it was based purely on credit card activity reports she received from Conoco Phillips, which Defendant contends were inadmissible hearsay documents. He insists that he has preserved this error because his counsel objected "as clearly as possible" to both the introduction of the "fuel company records" and to Ms. Cohn's testimony as to value. The State counters that this error was not preserved for review because Defendant did not object to either the question regarding value or to any references to the "activity reports" received from Conoco Phillips. For the following reasons, we agree with the State that this alleged error was not preserved for our review.

{14}    We reviewed the trial transcript in depth in order to fully understand Ms. Cohn's testimony and Defendant's objections. Ms. Cohn testified that she and her

husband owned the business, AC Towing, where Defendant had been a tow truck driver, and that she was the bookkeeper for AC Towing. Ms. Cohn stated that, as AC Towing's bookkeeper, she was responsible for billing customers, overseeing the company's payroll, and paying AC Towing's fuel bills so their drivers could purchase fuel. Ms. Cohn testified that each driver is issued a "fuel card" with a unique PIN number in order to pay for fuel and that each driver was supposed to enter their unique PIN and odometer reading when purchasing fuel. Only the driver and Ms. Cohn knew the individual driver's PIN number.

{15} After Defendant stopped working for AC Towing for the second time, AC Towing did not receive the company's fuel card from him. After some time, Ms. Cohn noticed irregularities pertaining to the fuel card that had been issued to Defendant. She stated it was her customary practice to pay AC Towing's fuel bill regularly without checking each transaction, but she decided to check every transaction after she noticed the fuel bills were irregularly high. When Ms. Cohn testified that she noticed Defendant specifically was using his fuel card after he was no longer an employee, defense counsel objected for lack of foundation, which was sustained.

{16} Presumably to lay a foundation, Ms. Cohn next described how she checked particular fuel charges after she noticed the irregularities. She called the fuel company, Conoco Phillips, for documentation they had on Defendant's fuel card

9

being swiped and she also called the gas station for any video footage of the card being swiped. Ms. Cohn testified that the documentation she received from Conoco Phillips was a list of all transactions, including times and dates of the transactions. The State then asked if the transactions were specific to each individual employee; defense counsel objected based on hearsay, and the objection was sustained. The State then asked "when you got the activity report, was that how you started verifying the fuel charges?" Ms. Cohn responded, "yes." The term "activity report" seems to have been used in reference to the extra transaction-related documentation Ms. Cohn had requested and received from Conoco Phillips.

{17}     The State next asked how Ms. Cohn "monitor[ed] the fuel reports in general." Ms. Cohn explained that the driver had his fuel card and PIN and that's how AC Towing monitored who purchased fuel. The State then referred to "credit card statement[s]" and "bills" and asked how Ms. Cohn, as part of her course of business, went about paying AC Towing's fuel bills. Ms. Cohn stated that she would get the credit card statement at the end of the month and would review the transactions in the monthly statements and that the drivers are supposed to turn in receipts after they purchase fuel. The State asked Ms. Cohn from where she was getting the "statements," to which Ms. Cohn replied "Conoco Phillips." When asked if she would recognize the statements, Ms. Cohn confirmed she would recognize the statements

from Conoco Phillips. Defense counsel objected, and the district court asked counsel to approach the bench.

**{18}** At the bench conference, defense counsel stated he may have objected too early, but that he was objecting to the use of the monthly credit card billing statements for both hearsay and foundation reasons because he did not believe the State had a custodian of records from Conoco Phillips; as such, he objected to "these being used in any manner whatsoever." The State argued that the statements were kept in AC Towing's regular course of business to monitor their fuel cards, that the statements showed the irregularities Ms. Cohn noticed regarding the use of Defendant's card and PIN, and that Ms. Cohn should be able to testify as to the billings AC Towing received on the fuel cards. The district court told the State that Ms. Cohn may testify that she received the bills, but "what those bills actually said though, I think you need somebody else to authenticate those specific records." During the conference, no one used the phrase "activity report." Rather, only "bills," "statements," and "records" were mentioned.

**{19}** As direct examination continued, the State asked to approach Ms. Cohn and then asked Ms. Cohn, "you indicated that you received from Phillips 66 a number of activity logs, and I do not want to get into any of the details of those logs, . . . Do you recognize these documents that have been previously marked State's Exhibits 1, 2,

3, 4, and 5?" Ms. Cohn responded, "yes, I do." The documents the State showed Ms. Cohn appear to be the activity reports, not the monthly statements that were objected to before and during the bench conference, since the "activity logs" were what the State referenced in its question. However, with no specification as to activity reports or monthly statements as the source of information, the State asked Ms. Cohn generally if there were fuel charges that AC Towing had to pay that were not charged by any of AC Towing's current employees, to which Ms. Cohn answered, "yes" before being cut off by an objection by defense counsel. The defense did not state a reason for his objection, and the court overruled the objection. It is reasonable to assume that the State's question as to fuel charges sought information that Ms. Cohn could know only from an analysis of either the activity reports, the monthly statements, or both. Defendant's counsel did not follow up with any request for a further bench conference or with a request to be heard on the specific basis for his objection.

{20} The State continued, asking Ms. Cohn approximately how much a non-employee had charged for fuel. "In total?" Ms. Cohn asked; "in total," the State repeated. Ms. Cohn replied, "approximately $4,500." The State paused for approximately ten seconds before ending its direct examination. Defendant did not object during or after this exchange.

{21} On cross-examination, Defendant's counsel asked five questions on four topics: whether more than one person ever used the same card, whether Ms. Cohn reviewed the fuel bills monthly, how long it took Ms. Cohn to realize the irregularities in the fuel bills, and whether Ms. Cohn remembered when Defendant was fired from AC Towing.

{22} In the context of this part of the trial, the record shows that Defendant's counsel made four objections in total with the following court rulings: first, a sustained foundation objection when Ms. Cohn testified that Defendant used his fuel card after he was no longer an employee; second, a sustained hearsay objection when the State asked if the activity logs were specific to individual employees; third, what appears to have been a sustained hearsay and lack of foundation objection when Ms. Cohn confirmed that she would recognize the monthly fuel bills; and finally, an overruled bare objection when the State asked whether Mrs. Cohn paid fuel charges that were unattributable to AC Towing's current employees. None of Defendant's objections related to the actual value of charges made by a non-employee, which is the specific testimony Defendant argues on appeal was erroneously admitted. Further, Defendant had ample opportunity to object to the activity reports' use in general for any substantive purpose and failed to do so. When the State asked to approach Ms. Cohn and showed her the documents marked as Exhibits 1-5, which we presume to

be the activity logs given the prosecutor's reference, Defendant did not object. As the State referenced the activity logs, Defendant did not object. While it is unclear whether Ms. Cohn was relying on the monthly statements or the activity logs, at the critical moment when the State explicitly asked Ms. Cohn how much was charged by a non-employee, Defendant did not object.

{23} We are not persuaded that any of Defendant's objections was sufficiently timely, specific, or ongoing to serve as a basis for claiming that the district court abused any discretion in connection with Ms. Cohn's testimony as to the value of fuel charges made by a non-employee of AC Towing. We are similarly not persuaded that Defendant preserved the objection on which he now relies. And, finally, it is unclear whether the testimony that Defendant complains of was ever the subject of an objection. We conclude that Defendant did not adequately or properly object or otherwise preserve an objection to Ms. Cohn's testimony as to value or to the use of the activity logs. *See* Rule 11-103(A)(1)(a) NMRA (requiring that in order to preserve a claim of error, a party must make a timely objection); *State v. Neswood*, 2002-NMCA-081, ¶ 18, 132 N.M. 505, 51 P.3d 1159 ("Generally, evidentiary objections must be made at the time the evidence is offered."); *State v. Smith*, 1999-NMCA-154, ¶ 9, 128 N.M. 467, 994 P.2d 47 (stating that this Court will not review an argument that was not preserved).

**Sufficiency of the Evidence**

{24}    Defendant contends that the State failed to prove that he used the fuel card and that the value of unauthorized charges was more than $2,500 because his conviction was based on inadmissible evidence and no video evidence was produced showing Defendant using the card. *See* UJI 14-1601 NMRA; § 30-16-1(A), (E).

{25}    "In reviewing the sufficiency of the evidence, [the appellate courts] must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (alteration, emphasis, internal quotation marks, and citation omitted).

{26}    The director testified at trial that, during their first conversation, Defendant told him that "he had taken the truck and he was using the truck and he used the card[.]" During their second conversation, Defendant told the director "he knew what he had done" and "he'd rather go to jail than pay [restitution]." Ms. Cohn testified that Defendant had been an employee of the towing company; as an employee, he had a fuel card; upon his termination, he did not return that card; after his termination, the

fuel charges increased; and the amount of unauthorized charges was approximately $4,500. Indulging all reasonable inferences in favor of the verdict, we conclude that the State presented sufficient evidence that Defendant used the fuel card and that the value of unauthorized charges was more than $2,500.

**CONCLUSION**

{27}    We affirm.

{28}    **IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**


**WE CONCUR:**


_____
**LINDA M. VANZI, Judge**


_____
**M. MONICA ZAMORA, Judge**

17